UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ARCHIE N. KELLEY, JR.,

       Plaintiff,

v.                                       Case No.  8:11-cv-613-T-24 AEP

NATIONAL UNION INSURANCE
COMPANY OF PITTSBURGH, PA,

       Defendant.
_____/

**ORDER**

       This cause comes before the Court on Defendant's Dispositive Motion for Summary

Judgment.  (Doc. No. 29).  Plaintiff opposes the motion.  (Doc. No. 41).  As explained below, the

motion is **GRANTED**.

**I.  Background**

       Plaintiff Archie Kelley filed this action against Defendant National Union Fire

Insurance Company of Pittsburgh ("National Union") seeking a declaration as to the

interpretation of an insurance policy.  Specifically, Kelley claims the defined term "permanent

total disability" in the policy should be required to conform to the broader definition of "total

disability" contained in Florida Statute Section 627.4233.  Kelley also alleges that National

Union made fraudulent and negligent misrepresentations about the policy's coverage in its

solicitation of Kelley and in its cover letter to Kelley confirming issuance of the insurance.

       According to Kelley, he received a flyer through his Advanta business credit card

advertising an income protection insurance plan that included permanent disability income

protection, accidental dismemberment, and hospitalization.[1]  (Doc. 39, p.1, ¶2).  Kelley believes

he received this flyer in the summer of 2002.  (Doc. 50-1, p.37).  The flyer did not define

"permanent disability" or explain that permanent disability required a loss of both hands or feet,

a loss of one hand and one foot, a loss of sight in both eyes, hemiplegia, paraplegia or

quadriplegia.  (Doc. 29, p.1,  ¶3; Doc. 50-1, p.43).

     In the fall of 2002, Kelley called the number on the flyer.  (Doc. 29, p.1 ¶4).  Kelley was

the sole proprietor of an air conditioning business in Tennessee, owned a farm in Tennessee, had

a wife and two children living at home with him in Tennessee, and was looking for insurance

coverage in case anything happened to him as the sole income provider for his family.  (Doc. 29,

p.2,  ¶4; Doc. 50-1, p.9).  Kelley spoke with a representative, shared his family and income

information with her, and learned that if he became disabled for any reason and was unable to

work, he would receive income to support his family.  (Doc. 29, p.2, ¶7; Doc. 50-1, p.44).

Kelley explained to the representative that he had had a recent health scare.[2]  (Doc. 50-1, p.44).

Kelley believes he received a document about the insurance after the call, but he does not have a

record of the document.[3]  (Doc. 29, p.2, ¶8).

     Kelley was involved in a serious car accident in January 2003.  (Doc. 29, p.3,  ¶10).

Several months later, Kelly contacted the income protection insurer because he was going to be

---

[1]  For purposes of this motion, the Court will assume the flyer came from National Union
(the underwriter) or AIG (the insurance provider).   Kelley no longer has a copy of the flyer.
(Doc. 50-1, p.9).

[2]  Kelley believes that he enrolled at that point for the income protection disability
insurance.  (Doc. 50-1, p. 9-11).

[3] There is no supporting transcript available of this call.

out of work for three or four months.[4]  (Doc. 29, p.3, ¶11).  The insurer notified Kelley of the

six- month waiting period for the insurance and suggested it was not worth filing a claim given

the waiting period and given that Kelley was expecting to be out of work only for three to four

months.  (Doc. 29, p.3, ¶11; Doc. 50-1, p.39).

On February 6, 2004, Kelley engaged in a recorded telephone conversation with a

National Union agent, Donna Mobley, about purchasing permanent disability insurance.  (Doc.

20, p.3,  ¶13; Doc. 31-2, Doc. 31, p.2).  Mobley confirmed that Kelley was enrolling in

catastrophic total and permanent disability insurance underwritten by National Union.  (Doc. 31-

2, p.1).  Mobley explained that the insurance would cover Kelley and his wife for up to

$1,200,000 in "total and permanent disability resulting from a covered accident."  (Doc. 31-2,

p.1).  Mobley confirmed that if after reviewing the complete details of the plan, Kelley did not

want the disability coverage, Kelley could call and cancel.  (Doc. 31-2, p.2).  Otherwise, the

coverage would go into effect in sixty days, and the premium of $14.95 would be billed on

Kelley's Advanta Bank corporate business card each month.  (Doc. 31-2, p.2).

After the agent explained the cancellation procedures, Kelley replied, "All right."  (Doc.

31-2, p.2).  Mobley then inquired about whether Kelley was receiving Medicare benefits.  (Doc.

31-2, p.2).  Kelley said no and that he was having a hard time hearing the agent.  (Doc. 31-2,

p.2).  The agent told Kelley that she was giving him only a brief description of the coverage

under the policy.  (Doc. 31-2, p.2).  She explained the policy was not a deposit guaranteed by a

bank or insured by the FDIC, bank, or other U.S. agency.  (Doc. 31-2, p.1-2).  Kelley then asked,

---

[4] Again, for purposes of this motion, the Court will assume Kelley contacted National
Union or AIG.

"Hello?" and the agent confirmed that she was still there.  (Doc. 31-2, p.2).  Kelley replied,

"Okay.  Yeah.  I'm fixing to lose you."  (Doc. 31-2, p.2).  The agent replied, "All right, as with

most insurance products, it contains reductions, limitations, exclusions, and termination

provisions.  These are explained in your description of coverage, which will arrive in about 10

days.  Would you like me to read the general exclusions and limitations to you now sir?"  (Doc.

31-2, p.2).  Kelley replied, "No.  That's all right.  I mean . . . get my packet."  (Doc. 31-2, p.2).

The agent confirmed that "it will be to you in writing" and that if there were any conflicts

between what they had discussed, the description of coverage, or the policy, that policy series

C11695DBG would govern.  (Doc. 31-2, p.2).  The agent provided the National Union phone

number, and Kelley thanked the agent.  (Doc. 31-2, p.2).

Kelley received a welcome letter from American International Companies ("AIG"),

noting that National Union was the underwriter of the Income Protector Plus plan in which

Kelley had enrolled for disability coverage.[5]  (Doc. 30, p.5-6; Doc. 30-1).  Kelley received the

letter at his Tennessee home.[6]  (Doc. 30-1, p.1; Doc. 50-1, p.16).  The welcome letter listed an

effective date for the disability coverage of April 6, 2004.  (Doc. 30-1).  The welcome letter

noted that unless Kelley called to cancel the disability coverage before that effective date, the

disability coverage would go into effect on April 6, 2004, and Kelley would be charged $14.95

per month, which would be automatically billed to his Advanta Bank business credit card.  (Doc.

30-1, pp. 2, 4).

---

[5]  The welcome letter is undated.

[6]  Kelley moved to Tampa, Florida, sometime in 2005.  (Doc. 50-1, p.13).  AIG sent a
copy of this letter to Kelley's Florida address following his move.  (Doc. 50-1, p.15; Doc. 30-1,
p.9).

The Description of Coverage ("DOC") for the income protection plan was attached to the welcome letter. (Doc. 30-1, pp.3-8). The welcome letter references the DOC. (Doc. 30-1, p.1). Kelley does not recall whether he read the DOC when he received it, but he did not read the section of the DOC that defined "permanent total disability" when he received it in Tennessee or in Tampa. (Doc. 50-1, pp. 19, 31). The first time Kelley read the complete DOC was after National Union denied his claim. (Doc. 50-1, p.36).

The DOC described the short- and long-term benefits to include certain monthly benefits according to a benefit schedule if the insured or the insured's spouse were "Permanently Totally Disabled." (Doc. 30-1, p.5). The DOC defined "Permanently Totally Disabled/Permanent Total Disability" in the Definition section of the DOC as:

1.      That You have or Your Insured Spouse has suffered any of the following:
(a) loss of both hands or feet; or
(b) loss of one hand and one foot; or
(c) loss of sight in both eyes; or
(d) Hemiplegia; or
(e) Paraplegia; or
(f) Quadriplegia

and

2.      You or Your Insured Spouse is permanently unable to perform the material and substantial duties of any occupation for which You or Your Insured Spouse is qualified by reason of education, experience, or training; and

3.      You or Your Insured Spouse require the supervision of a Physician, unless You have or Your Insured Spouse has reached the maximum point of recovery.

(Doc. 30-1, pp. 6-7; Doc. 30, pp. 8-9). The DOC also stated that, "[t]his is a brief description of the coverage available under policy series C11695DBG. If any conflict should arise between the contents of this Description of Coverage and the Master Policy SRG 9540478 or if any point is not covered herein, the terms and conditions of the Master Policy will govern in all cases."

5

(Doc. 30-1, p.4).

Master Policy SRG 9540478, which was referenced in the DOC, did not relate to Income Protection Insurance.  (Doc. 31-5).  Instead, it encompassed benefits relating to motor vehicle accidents.  (Doc. 31-5).  A permanent total disability rider was included as part of the benefits for motor vehicle accidents, which defined "permanent total disability" the same way as SRG 9540495 did.  (Doc. 31-5, pp. 56-7).  Mater Policy SRG 9540495 related to the Income Protection Insurance.  (Doc. 31-1).  Master Policy SRG 9540495 related to any accident except as a fare paying passenger on a commercial airline and included the definition of permanent total disability cited above.  (Doc. 31-1, pp. 2, 40-41).

On November 23, 2004, Kelley called National Union to inquire about his insurance policies.  (Doc. 39, p.4; Doc. 39-3, p.1).  The agent described the permanent total disability policy.  (Doc. 39-3, p.1).  She explained that the disability policy would provide benefits six months after becoming "totally and permanently disabled" due to any kind of accident, such as a car accident or a fall down some stairs at home.  (Doc. 39-3, p.1).  She summarized the monthly payments in the event of a permanent total disability.  (Doc. 39-3, p.1).  Kelley confirmed that he had received information about the policies when he first applied for the coverage, but that he never saw the policies.  (Doc. 39-3, p.1).  The agent volunteered to send a copy of the policy to Kelley.  (Doc. 39-3, p.2).  Kelley provided the agent with his Tennessee address.  (Doc. 39-3, p.2).  The agent told Kelley that if he looked over the disability policy and had any questions about it, to call back.  (Doc. 39-3, p.2).

Kelley called National Union again on July 30, 2007.  (Doc. 39-4, p.1).  The agent attempted to verify Kelley's Tennessee address, and Kelley notified the agent that he used to live

6

in Tennessee, but he currently lived in Tampa, Florida.  (Doc. 39-4, p.1).  Kelley noted that the

Tennessee address was for his farm in Tennessee, but that he was living in Tampa now.  (Doc.

39-4, p.1).  Kelley and the agent discussed that he had a disability policy and the agent noted that

the disability policy provided coverage if Kelley was "permanently disabled due to an accident."

(Doc. 39-4, p.2).

 In 2008, Kelley fell off of a ladder.  As a result, Kelley suffered a back injury that

required surgery, caused him significant pain, and made it impossible for him to financially

support his family.  (Doc. 39, p.11).   Kelley called AIG on August 27, 2008 and reported his

accident.  (Doc. 39-5, p.1).  The agent stated that Kelley had one policy for permanent disability

if he were in any type of accident.  (Doc. 39-5, p.3).  The agent asked Kelley if he had a copy of

the policy, and Kelley said he thought he did.  (Doc. 39-5, p.3).  The agent said she would re-

send the policy anyway.  (Doc. 39-5, p.3).  The agent emphasized that it was very important to

look over the benefits to see how they could be used.  (Doc. 39-5, p.3).  Kelley then replied,

"Okay, Insurance is like Greek to me, you know.  I'm an air conditioning guy, uhh but, so I, I

mean I should have, I'm covered for this right?  I mean that's why . . . ."  (Doc. 39-5, p.3).  The

agent replied that the disability insurance covers any type of accident.  (Doc. 39-5, p.3).  The

agent told Kelley that she was sending the information to Kelley and that if he had any questions

to call.  (Doc. 39-5, p.4).  Kelley explained that he had had MRIs and was scheduled for surgery.

(Doc. 39-5, p.4).  Kelley inquired about how to make a claim.  (Doc. 39-5, p.4).  The agent said

that she would send the claim form to him.  (Doc. 39-5, p.6).

 AIG sent Kelley a claim form for permanent total disability benefits dated December 4,

2008, and Kelley submitted the form on December 18, 2008.  (Doc. 30, p.42-4; Doc. 30-1, p.51).

National Union denied Kelley's claim for permanent disability benefits.[7]  (Doc. 30-1, p.63).  The

letter stated that the denial was because the disability was not due to dismemberment.  (Doc. 30-

1, p.63).  Kelley wrote a letter to National Union appealing the denial on February 23, 2009.

(Doc. 30-1, p.57).   At the time Kelley wrote the appeal letter, he still had not noticed the

definition of "permanent total disability" in the DOC.  (Doc. 50-1, p.48).  Kelley states he would

not have purchased the disability insurance had he known that the disability definition required

dismemberment injuries.  (Doc. 39, p.10).  Rather, he would have purchased disability insurance

that provided income if he were disabled as the result of an accident and unable to work to

support his family.  (Doc. 39, p.10).

On March 23, 2011, Kelley filed suit against National Union.  In his complaint, he asserts

four claims: (1) breach of contract, (2) a statutory bad faith claim,[8] (3) negligent

misrepresentation, and (4) fraudulent misrepresentation.  Thereafter, National Union filed the

instant motion for summary judgment.

## II.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The Court must draw all inferences from the evidence in the light most favorable to the

non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d

1315, 1320 (11th Cir. 2006) (citation omitted).  The moving party bears the initial burden of

showing the Court, by reference to materials on file, that there are no genuine issues of material

---

[7] The letter is undated.  (Doc. 30-1, p.63).

[8]  The bad faith claim has been stayed.  (Doc. 8).

fact that should be decided at trial.  See id. (citation omitted).  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## III.  Motion for Summary Judgment

National Union argues that it is entitled to summary judgment on the breach of contract claim, as well as the negligent and fraudulent misrepresentation claims.  Specifically, National Union argues that Florida law does not apply to the breach of contract claim, because the contract contained a choice-of-law provision that provided for the law of the state where the policy was delivered to govern, and the disability policy was not delivered in Florida.  (Doc. 29, p.12).  National Union further denies that it made any misrepresentations about the coverages provided by the disability policy when it enrolled Kelley or sent him the welcome letter and DOC.  (Doc. 29, p.21).[9]  Accordingly, the Court will analyze both arguments.

### A. Master Policy

As an initial matter, the DOC sent to Kelley did not reference the correct Master Policy, which governs if a conflict arose between the DOC and the Master Policy.  (Doc. 31-5).  The DOC sent to Kelley referenced Master Policy SRG 9540478, which applied to benefits relating

---

[9]  National Union argues that it is improper for Kelley to assert additional claims of misrepresentation in his response brief for post-enrollment conduct based upon phone conversations on November 23, 2004, July 30, 2007, and August 28, 2008, when these claims were not asserted in the Complaint.  (Doc. 50, pp. 2-3).  The Court agrees, and notes that the substance of the subsequent conversations and the alleged negligent and fraudulent misrepresentations therein, are of the same type as in the initial enrollment call, essentially a failure to define permanent total disability to Kelley.  As such, even if the Court were to consider these subsequent phone calls, it would not change the outcome of its analysis.

to motor vehicle accidents.  (Doc. 31-5, p.2).  If Master Policy SRG 9540478 were to govern, Kelley would not be entitled to disability benefits because he was not injured in a motor vehicle accident.  (Doc. 31-5, p.2).  Given the error by National Union in the DOC, this Court will construe the error against National Union, and will assume that Kelley had coverage under a disability policy connected with Master Policy SRG 9540495.[10]

### B.  Breach of Contract

National Union and Kelley disagree about whether Florida law applies to the disability insurance contract.  In diversity cases, the Court applies the substantive law of the forum, Florida, including Florida's choice of law rules.  See Muniz v. CGA Servs. Group, 2006 U.S. Dist. Lexis 52194, *12 (M.D. Fla.  July 28, 2006).  Given that this is a contract action, Florida applies the *lex loci contractus* doctrine, and applies the law of the state in which the contract was made.  Id.  In Florida, the last act necessary to create a contract is acceptance.  Id. at 14.  Florida also gives deference to the parties' choice of law and, unless violative of public policy, will defer to contractual choice of law clauses.  Id.  The *lex loci contractus* doctrine points to Tennessee law and the contractual choice-of-law provision points to Delaware law as the controlling law.  Neither point to Florida law as the controlling law.

Kelley accepted the offer of insurance by phone in Tennessee and the DOC was delivered to him in Tennessee.[11]  (Doc. 30-1; Doc. 50-1, p.16).  Master Policy SRG 0540495 contained a

---

[10]  National Union does not argue otherwise and notes the "scrivener's error."  (Doc. 29, p. 6).

[11]  The Court recognizes that delivery of a policy description alone does not constitute delivery of a policy, see Albury v. Equitable Life Assurance Soc., 409 So. 2d 235. 236 (Fla. DCA 1982), but it does corroborate the earlier acceptance.

choice-of-law provision which stated, "[t]his [p]olicy is governed by the laws of the state in which it is delivered."[12] (Doc. 31-3, p.11). National Union delivered the policy to AIG Insurance in Delaware. (Doc. 40-1, p.17). As such, Delaware or Tennessee would apply under the *lex loci contractus* doctrine or the choice-of-law provision, and not Florida law.

Although there is a narrow exception to the *lex loci contractus* rule, if 1) a Florida citizen is in need of protection; 2) there is a paramount public policy; and 3) the insurer is on reasonable notice that the insured is a Florida citizen, see State Farm Mut. Auto. Ins. v. Roach, 945 So. 2d 1160, 1164-65 (Fla. 2006), in this case, the insurer was not on reasonable notice that the insured was a Florida citizen. Although Kelley notified the insurer of a change of his address when asked to confirm the Tennessee address during a telephone call in July 2007, Kelley also stated in that phone call that the Tennessee address was for his farm and that "if [the agent] want[ed] to change [the address,]" the Florida address was 1214 East Lambright Street, Tampa. (Doc. 39-4, p.1). At the very least, Kelley did not make clear that he no longer intended to return to Tennessee. Kelley delegated the decision of whether to change his address to the insurer, rather than asserting that he was no longer a Tennessee resident. Under these circumstances, National Union cannot be presumed to have had knowledge that Kelley had permanently changed his residence. See id. at 1168; see also State Farm Mut. Auto. Ins. v. Duckworth, 660 F. Supp. 2d 1323, at1333 (M.D. Fla. 2009) (holding that insured did not give reasonable notice to insurer of change of permanent address when insured submitted a notice of change of address form but did

---

The DOC was delivered from AIG, which had a Jacksonville, Florida address listed on the letterhead of the DOC. (Doc. 30-1, p.17). The Master Policy SRD 9540495 was issued in the state of Delaware to the AIG trust. (Doc. 40-1, p.17).

[12] Policy SRG 9540478 contains the same choice-of-law provision. (Doc. 31-5, p.22).

11

not indicate that the move to Florida would be permanent); see also N. J. Manuf. Ins. v. Woodward, 456 So. 2d 552, 553-54 (Fla. 2d DCA 1984) (holding submission of change of mailing address form to insurer insufficient to show change of permanent residence).[13]

Given that: 1) Kelley accepted the insurance while in Tennessee, 2) the policy states it is governed by the law of the state in which the policy is delivered, Delaware, and 3) the public policy exception does not apply, Florida law does not govern the contract. As such, the definition of "total disability" as defined in Florida Statute Section 627.4233[14] does not apply to this contract and does not override the explicit contractual definition of permanent total disability contained in the contract. As a result, Kelley's breach of contract claim fails, because he is not permanently totally disabled, as defined under the policy.

## C. Misrepresentations

With respect to the fraudulent and negligent misrepresentation claims, in diversity tort cases, this Court applies the law of the forum state, Florida. Trumpet Vine Invs, N.V. v. Union Capital Partners I., 92 F.2d 1110, 1115 (11th Cir. 1996). Florida applies the significant

---

[13] In addition, it is unlikely that there is a paramount public policy that would require replacement of the contractual definition of permanent total disability with Florida's statutory definition. See Shaw v. National Union, 08-CV-00608, at 9-10 (M.D. Fla. Aug. 14, 2009) (granting defendant's motion for summary judgment, finding the same National Union permanent disability definition as in this case unambiguous and noting, "[w]hile the Court sympathizes with Plaintiff's predicament and agrees that the policy significantly restricts the definition of disability, the Court cannot rewrite the document."); aff'd, Shaw v. National Union, 605 F.3d 1250, 1256 (11th Cir. 2010).

[14] Florida Statute Section 627.4233 provides, in relevant part, that "total disability" is defined, in part, as, "[i]f an individual or group policy of life insurance provides for . . . payment of claims upon total disability, the definition of total disability may not be more restrictive than the person's inability to perform any work or occupation for which the person is reasonably qualified or trained."

relationship test of the Restatement (Second) of Conflict of Laws.  See id. at 1115-16.  The

Restatement (Second) of Conflict of Laws § 145 states that considerations for the significant

relationship test include the place where the injury occurred, the place where the conduct

allegedly causing the injury occurred, the domicile, residence, nationality, place of incorporation

and place of business of the parties, and the place where the relationship between the parties is

centered.  Bishop v. Fla. Special Paint Co., 389 So. 2d 999, 1000-01 (Fla. 1980) (citing

Restatement (Second) of Conflict of Laws § 145).

     In this case, the insurance agent made representations regarding the purchase of the

insurance to Kelley in Tennessee.  The welcome letter was also sent to Kelley's address in

Tennessee.  (Doc. 30-1, p.1; Doc 50-1, p.16).  The injury from the alleged misrepresentations

therefore occurred in Tennessee, where Kelley was residing.[15]  Thus, the place where the

relationship between the parties was centered was Tennessee.  Considering these factors, and the

allegations of misrepresentation, Tennessee had the most significant relationship to the conduct.

     Under Tennessee law, in order to sustain a claim for fraudulent misrepresentation, the

plaintiff must show that: 1) the defendant made a representation of an existing or past fact; 2) the

representation was false when made; 3) the representation was in regard to a material fact; 4) the

false representation was made either knowingly or without belief in its truth or recklessly; 5) the

plaintiff reasonably relied on the misrepresentation; and 6) the plaintiff suffered damage as a

result of the misrepresentation.  See Strange v. Peterson, 2001 WL 29461, *2 (Tenn. Ct. App.

Jan. 11, 2001); see also Bowman v, Waggoner, 2006 WL 140377, *3 (Tenn. Ct. App. Jan. 17,

---

    [15]  AIG sent the welcome letter to Kelley in Tennessee from Jacksonville, Florida.  (Doc. 30-1, p.1).

2006).

Kelley's fraudulent misrepresentation claim fails because National Union did not make a false representation.  The agent used the words "total and permanent disability" when describing the coverage.  (Doc. 31-2, p.1).  She further stated that, "this [was] only a brief description of the premium coverage under the policy."  (Doc. 31-2, p.1).  The agent explained that there were limitations and exclusions to the coverage and asked if Kelley wanted them read to him over the phone.[16]  (Doc. 31-2, p.2).  Kelley declined having the exclusions read to him and acknowledged that he knew he would be receiving a packet of materials by mail.  (Doc. 31-2, p.2).  The agent confirmed that the materials would arrive in writing and that if there were any conflicts between their conversation, the description of coverage, or the policy, that the policy would govern, and that if Kelley had any questions, he should call National Union.  (Doc. 31-2, p.2).

AIG sent Kelley a DOC that clearly defined "permanent total disability."  (Doc. 30-1, pp. 6-7).  The DOC was six pages long, including the cover page.  (Doc. 30-1, pp. 3-10).  The definition of Permanent Total Disability was written in the same font as the rest of the document and was not in any way hidden or obscured.  (Doc. 30-1, pp. 6-7).  The DOC did not misrepresent the definition of "permanent total disability" in any way.  The welcome letter that accompanied the DOC stated that Kelley could call to cancel the insurance before the effective date.  (Doc. 30-1, p.2).  The welcome letter referenced the DOC and asked Kelley to look at it. (Doc. 30-1, p.1).

---

[16]  These limitations and exclusions were not the same as the definition of "permanent total disability."  They were additional exclusions relating to suicide, sickness, felonies, war, athletics, armed forces, aircraft, worker's compensation, and drugs that agents were prepared to read by phone when requested.  (Doc. 31-1, p.15-16; Doc. 42-35, pp. 6, 8).

Kelley did not read the definition of "permanent total disability," and he is uncertain whether he read any of the DOC.  (Doc. 50-1, pp.19, 31).  The facts that Kelley did not read his coverage description and that all of the policy provisions were not detailed in a short enrollment phone call, do not mean that National Union misrepresented anything.  In fact, National Union indicated to Kelley that their conversation relayed only a brief description of the coverage and that the complete details would arrive in writing.  (Doc. 31-2, p.1).  The agent suggested to Kelley that if he observed conflicts between the writing and the phone conversation, to call back. (Doc. 31-2, p.2).  See, e.g., Rodriguez v. J.C. Penney Life Ins., 2006 WL 208775, *2-3 (M.D. Fla. Jan. 25, 2006) (finding no false statement in fraudulent inducement claim when plaintiff did not understand that policy covered only her and not her family members based on brief phone conversation, plaintiff expected terms to be spelled out more completely in written document, plaintiff had opportunity to review the documents before paying, and written document explained coverage was only for plaintiff and for a covered accident).

Kelley's claim for negligent misrepresentation fails for the same reasons the claim failed in Rodriguez – National Union did not make a false statement.  Under Tennessee law, a claim for negligent misrepresentation is established when the defendant: 1) supplied information to the plaintiff; 2) the information was false; 3) the defendant did not exercise reasonable care in obtaining or communicating the information; and 4) the plaintiff justifiably relied on the information.  See Strange v. Peterson, 2001 WL 29461, *2 (Tenn. Ct. App. Jan. 11, 2001).  In this case, National Union did not provide any false information to Kelley.  For this reason, his

15

claim for negligent misrepresentation fails.[17]

**D. Bad Faith**

This Court had stayed Count II, a statutory bad faith claim, pending resolution of the coverage determination.  (Doc. 8).  In order for a cause of action for bad faith to accrue, it must first be established that coverage and damages exist.  See Blanchard v. State Farm Mut. Auto. Ins. Co., 575 So. 2d 1289, 1291 (Fla. 1991).  Given that the Court has determined that there was no breach of contract and that coverage for Kelley's injury did not exist under the policy, Count II must be dismissed.

**IV.  Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that (1) Defendant's Motion to Strike Portions of the Declaration of Archie Kelley and Exhibits A, B, and C to the Declaration (Doc. 48) and Defendant's Motion to Strike Certain Exhibits Attached to the Deposition of Elizabeth Hartman Filed by Plaintiff in Opposition to Defendant's Motion for Summary Judgment (Doc. 49) are both denied as moot, (2) Defendant's Dispositive Motion for Summary Judgment (Doc. 29) is **GRANTED**, (3) the stay is lifted for Count II (Doc. 8), and Count II is **DENIED**, and (4) the Clerk is directed to enter judgment in favor of National Union and to close the case.  The pre-trial conference scheduled for June 7, 2012 is cancelled.

**DONE AND ORDERED** at Tampa, Florida, this 29th day of May, 2012.

---

[17] The misrepresentation claims would similarly fail under Florida law because Florida law also requires a false statement.  See C&J Saap Pub. Co., v. Tandy Corp., 585 So. 2d 290, (Fla. 2d DCA 1991) (fraud requires a false statement); Golden v. Complete Holdings, Inc., 818 F. Supp. 1495, 1498 (M.D. Fla. 1993) (negligent misrepresentation requires a misrepresentation).

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record